531 A.2d 829

Annette Horsefield, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Submitted on briefs July 22, 1987, to Judges CRAIG and PALLADINO, and Senior Judge BARBIERI, sitting as a panel of three.

*Robert M. Cohen, Blair Legal Services Corporation,* for petitioner.

*Jonathan Zorach,* Assistant Counsel, with him, *Clifford F. Blaze,* Deputy Chief Counsel, for respondent.

OPINION BY JUDGE PALLADINO, September 29, 1987:

This is an appeal from a decision of the Unemployment Compensation Board of Review (Board) affirming the referee's denial of benefits to Annette Horsefield (Claimant), under Section 3 of the Unemployment Compensation Law, Declaration of Public Policy.[1]

Claimant was employed by Cesare Battisti Mutual Benefit Association (Employer) as a part-time bartender for 1½ years until her termination on January 26, 1986. The referee's findings which are pertinent follow:

3. The claimant in December 1984 prior to working for her last employer was arrested by

---

[1] Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §752.

the Pennsylvania State Police and Charged with two violations of the Controlled Substance Act.

4. The claimant on December 2, 1985 pleaded guilty to the charges and was sentenced to two years probation with a fine, restitution and costs of $660.00. This appeared in the local newspaper.

5. The PLCB (Pennsylvania Liquor Control Board) notified the employer that because of claimant's conviction on December 2, 1985 she was to be terminated.

6. The employer on January 26, 1986 notified the claimant that she was terminated pending a further review. The employer is writing to the PLCB and trying to have claimant permitted to work.

7. The claimant's conduct in December 1984, her arrest and conviction on December 2, 1985 was inconsistent with acceptable standards of behavior and does *directly* reflect upon her ability to perform her assigned duties.

(Emphasis in original.)

On appeal to this court,[2] Claimant asserts that the use of Section 3 to deny her benefits was improper or in the alternative that there was an insufficient nexus between Claimant's conduct and her ability to perform her job. Whether Section 3 is applicable or whether Claimant's conduct is sufficient to make her ineligible for benefits under Section 3 are questions of law subject

---

[2] Our scope of review in an unemployment compensation case is limited to a determination of whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704; *Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986).

to our review. *Unemployment Compensation Board of Review v. Derk*, 24 Pa. Commonwealth Ct. 54, 353 A.2d 915 (1976).

As to her argument that Section 3 was improperly used, it is well settled that this section may be a substantive basis for denial of unemployment compensation benefits to employees who are discharged as a result of non-work-related incidents. *Adams v. Unemployment Compensation Board of Review*, 40 Pa. Commonwealth Ct. 486, 397 A.2d 861 (1979).

As to the argument that the nexus between her conduct and the ability to perform her job is not sufficient, the question of whether an employee's conduct is such as to disqualify her from benefits under Section 3, has been dealt with by this court which has applied the two prong test formulated in *Derk*. "In order to deny compensation . . . [t]he employer must present some evidence showing conduct of the claimant leading to the criminal arrest which is inconsistent with acceptable standards of behavior and which directly reflects upon his ability to perform his assigned duties." *Derk*, 24 Pa. Commonwealth Ct. at 57, 353 A.2d at 917. "Proof of a criminal conviction, the type of which would directly reflect on the ability of a claimant to continue in the type of position that he held, would constitute highly persuasive, if not controlling, evidence of a violation of the restrictions of Section 3 of the Act." *Id.* at 57 n. 2, 353 A.2d at 917 n. 2.

This court has considered a number of factors to determine whether the employee's conduct "reflects adversely on his fitness to do his job." *Snelson v. Unemployment Compensation Board of Review*, 93 Pa. Commonwealth Ct. 539, 545, 502 A.2d 734, 737 (1985). Some of these factors are: "(a) the specific nature of the offense committed by Claimant; (b) the nature of Claimant's assigned duties; (c) whether Claimant's job

requires any special degree of trust on the part of the employer; and (d) any other circumstances which may particularly affect Claimant's ability to do his job," *Southeastern Pennsylvania Transportation Authority v. Unemployment Compensation Board of Review,* 96 Pa. Commonwealth Ct. 38, 43, 506 A.2d 974, 977 (1986). When making this determination, the *Snelson* court's reasoning was as follows:

> [N]o single factor is necessarily dispositive of the issue of whether a claimant's conduct reflects adversely on his fitness to do his job. Rather, if an examination of all relevant circumstances, including especially the nature of the conduct in question, leads to the conclusion that a claimant's conduct is incompatible with his job responsibilities, then the second prong of the *Derk* test is satisfied. While a consideration of a claimant's specifically assigned duties may be relevant to this determination, if it is otherwise apparent that the claimant's conduct was inimical to the interests of his employer, it is not necessary for an employer to present into evidence a description of a claimant's specific duties.

*Snelson,* 93 Pa. Commonwealth Ct. at 545, 502 A.2d at 737.

In the case at bar, Claimant was convicted after she pleaded guilty to two violations of the Controlled Substance Act.[3] Certainly for someone who works as a bartender this is conduct contrary to acceptable standards and satisfies the first prong of the *Derk* test.

The question then remains whether her conduct reflects adversely on her fitness to do her job as a bartender. There was testimony that Claimant's conviction

---

[3] The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P.L. (1972) 233, *as amended,* 35 P.S. §780-113.

was reported in the newspaper, that there were rumors circulating in the club about Claimant and her ability to work for Employer, and that Employer could be fined or lose his liquor license because of Claimant.[4] A

---

[4] Relevant testimony was as follows:

QR: How did the employer find out about this?

AC: I called Bill when I was arrested and I was at the magistrate's office. I called Bill, I wasn't sure what was going on.

QR: He found out from you then?

AC: Yes.

QR: Then, once you were sentenced, you told him?

AC: Somebody saw it in the paper and I didn't even know that it was in the paper and he asked me and I told him.

QR: How did the PLCB find out?

AEW1: I don't know.

AC: They told me that somebody called them.

AEW2: Rumors started going through the club as to how she could be there when she is on probation and she said to go to the probation officer and get a letter stating she could work. They gave us the letter.

QR: The probation officer gave you a letter?

AEW1: Saying it was alright for her to work as far as they were concerned; but we had to clear it with the liquor control board. So the secretary called the liquor control board and he said, no way can she work there while she is on probation. We were trying to help her out and there was nothing we could do in the matter. We wrote to Harrisburg and they are dragging their feet.

QR: Who told you that she was to be suspended?

AEW1: The liquor control board man, Messina. I said, can't she work because she really needs the money. He said that all we have to do is get one complaint and we would get into real trouble. All we need is one complaint and the rumors were going through the club and we were scalred [sic] that we would get into trouble.

QR: Then you said she was suspended?

AEW1: Yes until this got squared away with the liquor control board. As far as we are concerned, she can come to work.

. . . .

bartender's job embraces more than the mere act of passing a drink across a bar. The integrity and the reputation of the bar are tied inextricably to the character of the bartenders who interact with the customers. While there is no doubt that conviction for drug violations may not prevent Claimant from performing the physical act of making and serving a drink, there is no denying that customers may choose to go elsewhere for potation rather than patronize a bar where the bartender is connected with drugs. Although the crime did not occur on Employer's premises, Claimant's conduct was clearly inimical to her Employer's interests.

After reviewing the record, we agree with the Board's determination that the above factors provide sufficient evidence to support a conclusion that Claimant's conduct and subsequent conviction are incompatible with her responsibilities as a bartender. Since both prongs of the *Derk* test are satisfied, we conclude that Claimant was at fault under Section 3, and benefits were properly denied. Accordingly, we affirm.

## ORDER

AND NOW, September 29, 1987, the order of the Unemployment Compensation Board of Review in the above-captioned matter is affirmed.

---

QR: Did the LCB say it would affect your license or what?

AEW2: Any complaint and we could be shut down or fined, it depends.